## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CYNTHIA NICHOLS, individually, | § | |
| and as representative of the | § | |
| ESTATE OF JASON LEJUNIE, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-2820 |
| | § | |
| BRAZOS COUNTY and CHRISTOPHER C. KIRK, | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion to dismiss plaintiff Cynthia Nichols's first amended complaint filed by defendants Brazos County (the "County") and Sheriff Christopher C. Kirk. Dkt. 13. After considering the motion, response, reply, amended complaint, and the applicable law, the court is of the opinion that the motion should be GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

This lawsuit relates to the death of plaintiff Cynthia Nichols's son, Jason LeJunie, approximately four days, or 84 hours, after LeJunie was released from Brazos County Detention Center ("BCDC"). Prior to his detention, LeJunie had been diagnosed with several different medical conditions, including blood clots in both of his legs, high blood pressure, one kidney, EFIDS, a back injury, gout, anxiety, and phlebitis, which is also known a deep vein thrombosis ("DVT"). Dkt. 11. Nichols contends that LeJunie always took the medicine that was prescribed for his medical conditions and that DVT is a chronic illness that may cause complications if medication is not taken. *Id.* Nichols alleges that LeJunie was arrested on May 3, 2018, for past-due child support after a traffic stop and that after intake LeJunie was released into the general jail population despite the

medical personnel at the jail knowing that LeJunie had several medical conditions. *Id.* The BCDC allegedly contacted LeJunie's primary care physician to request medical records the day after LeJunie's arrest.[1] *Id.* Nichols contends that she did not hear from LeJunie until three days after his arrest—after she had filed a missing person report because it was rare for him not to call her. *Id.* According to Nichols, the BCDC did not allow LeJunie to make a telephone call the first three days of his detention. *Id.*

Nichols states that she informed the BCDC about LeJunie's serious health conditions as soon as she found out where LeJunie was and let the BCDC know that LeJunie was likely suffering from Xanax withdrawal, which she contends limited his ability to recall all of his medication history. *Id.* Nichols asserts that LeJunie called her on May 6 and informed her that the jail officials refused to give him his medication. *Id.* Nichols alleges that she called the BCDC again and reminded them about LeJunie's health conditions. *Id.* Nichols asserts that LeJunie received a "white pill" that day, but the medical supervisor, nurse, and jail physician would not tell LeJunie what the pill was when he inquired. *Id.* The BCDC did not receive LeJunie's medical records until May 8, 2018 – five days after LeJunie was incarcerated. *Id.*

According to Nichols, LeJunie complained of leg pain and swelling but was never given his prescribed medications while in custody. *Id.* Nichols contends that by May 10, 2018, she was so worried about LeJunie that she again contacted the jail and also contacted Texas Governor Gregg Abbott. *Id.* She informed the Governor about LeJunie's health problems, that he had been in jail for seven days for back child support, and that the jail had received his medical records on May 8

---

[1] Nichols contends that the medical records indicate that LeJunie was prescribed 2 mg of Alprazolam (or Xanax) three times a day, 325 mg of Aspirin one time per day, 20 mg of Lisinopril 10 mg once a day with 25 mg hydrochlorothiazide, warfarin 5 mg tablet, 1 tablet every day, and 10 mg Oxycodone every four to six hours.

before lunch but had still failed to give LeJunie his medications; she also advised the Governor that the blood clot in LeJunie's leg could travel up and kill him at any time. *Id.* On the same day that Nichols contacted the Governor, the BCDC placed LeJunie in a holding cell all day and then released him that evening. *Id.* LeJunie called his mother and advised her that he was never given his medicine. *Id.* Nichols picked LeJunie up at 9:22 p.m. and gave him his medications, which he immediately took as they were driving home. *Id.* However, Nichols contends the damage was already done. *Id.*

On May 14, 2018, LeJunie was pronounced dead in his home. *Id.* The autopsy report states that the death was a result of a pulmonary embolism due to DVT. *Id.* Nichols contends that the DVT and other medical conditions were exacerbated due to the failure to administer medications during LeJunie's incarceration and that the failure to provide medication during incarceration caused LeJunie's death. *Id.* Nichols explains that one of LeJunie's essential medications, Warfarin, helps keep clots from growing or breaking off and traveling and prevents new clots from forming; she asserts that if LeJunie had been given this medication while he was being detained, and if he had been issued a bottom rather than top bunk, he would still be alive today. *Id.*

On July 31, 2019, Nichols filed a complaint in this court asserting claims against the County and Kirk under 42 U.S.C. § 1983, alleging that LeJunie's death was caused by the defendants' violations of LeJunie's constitutional rights of due process, freedom from unreasonable search and seizure, and the privileges and immunities and rights guaranteed by the Fourteenth Amendment. Dkt. 1. She additionally asserted claims as LeJunie's survivor under the Texas wrongful death statute. *Id.*

Kirk and the County filed a motion to dismiss on November 11, 2019, and Nichols amended her complaint on December 2, 2019. Dkts. 9, 11. In the amended complaint, Nichols added claims

3

against an unnamed medical supervisor, jail physician, and jail nurse.  Dkt. 11.  The court denied the original motion to dismiss as moot.  Dkt. 14.  Nichols and the County filed a motion to dismiss the amended complaint on December 16, 2019.  Dkt. 13.  Nichols filed a response, and the defendants filed a reply.  Dkts. 15, 17.  The motion to dismiss the amended complaint is now ripe for disposition.

## II. LEGAL STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65 (2007).  In considering a Rule 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual allegations contained in the complaint as true.  *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).  The court does not look beyond the face of the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6).  *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).  "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citations omitted).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  The supporting facts must be plausible—enough to raise a reasonable expectation that discovery will reveal further supporting evidence.  *Id.* at 556.

## III. ANALYSIS

The defendants argue that (1) Nichols has not stated a claim against Kirk in his individual or official capacities; (2) she does not assert a claim for which the County can be liable under *Monell*; (3) she has not adequately alleged a conditions of confinement or episodic act or omission claim

4

under § 1983; (4) she does not state a claim under the Fourth Amendment; and (5) any claims for state-law negligence are barred by governmental immunity.  Dkt. 13.  The defendants invoke governmental immunity in the motion with regard to the state-law claims, but they do not invoke immunity with regard to the constitutional claims.  The court will therefore analyze the constitutional claims under the plausibility standard from *Twombly* and *Iqbal* but will not consider a potential qualified immunity defense.[2]  *Cf. Randle v. Lockwood*, 666 F. App'x 333, 336 (5th Cir. 2016) (noting that the district court should have considered a qualified immunity defense "*because the jailers asserted this defense in both their motions to dismiss and their objections*" (emphasis added to show the contrast to this case)).  The court will first address the legal standard for constitutional challenges relating to pretrial detention, in general, and then it will address each of the defendants' arguments *in seriatim*.

A.      **The Constitutional Rights of a Pretrial Detainee**

A pretrial detainee has not been convicted of a crime and thus retains "at least [the] constitutional rights that [the U.S. Supreme Court has] held are enjoyed by convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861 (1979).  However, a "detainee . . . does not possess the full range of freedoms of an unincarcerated individual," as the "fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights." *Id.* at 546.

---

[2]   "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).  An officer is "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088 (2012)).

"The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment." *Estate of Henson v. Wichita Cty.*, 795 F.3d 456, 462 (5th Cir. 2015).  "The Fourteenth Amendment requires that state officials not disregard the 'basic human needs of pretrial detainees, including medical care.'" *Estate of Henson v. Krajca*, 440 F. App'x 341, 343 (5th Cir. 2011) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc)); *see also Wichita Cty.*, 795 F.3d at 462 (quoting this language from *Krajca*).  "[T]he substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee." *Wichita Cty.*, 795 F.3d at 462.  When a pretrial detainee contends that his or her rights were violated due to general conditions, practices, rules, or restrictions of confinement, courts must consider whether the restriction on rights "was reasonably related to a legitimate governmental interest." *Hare*, 74 F.3d at 641.  When the detainee contends that the deprivation was due to episodic acts or omissions of a state jail official, the detainee must demonstrate "that the official acted or failed to act with deliberate indifference to the detainee's needs." *Id.* at 648.

Here, Nichols, as the representative of LeJunie's estate and on her own behalf, has elected to sue the County, the County's alleged policymaker, Kirk, in his individual capacity, and various unnamed personnel for what she contends are violations of LeJunie's rights during his detention in BCDC.  Dkt. 11.  A person who believes his or her constitutional rights were violated during pretrial detention may sue any "person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia" subjected them to the deprivation under 42 U.S.C. § 1983.  42 U.S.C. § 1983.  The U.S. Supreme Court has held that Congress intended for "municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 690, 98 S. Ct. 2018 (1978).  This means that municipalities "can be sued directly under § 1983 for monetary, declaratory,

or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* Additionally, municipalities "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* The municipality, however, cannot be held liable solely because it employed a tortfeasor. *Id.* Rather, it is only liable "when execution of government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

In addition to her claim against the municipality, Nichols asserts claims against Kirk and other unnamed officials. If an official is sued in his or her "official capacity," this is just "another way of pleading an action against [the] entity of which an officer is an agent." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (citing *Monell*, 436 U.S. at 691 n.55). Therefore, "[s]uits against state officials in their official capacity . . . should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358 (1991). If the official is instead sued in his or her individual capacity, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099 (1985). However, an official who is a "supervisor is not personally liable for his [or her] subordinate's actions in which he [or she] had no involvement." *James v. Tex. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008). Instead, a "plaintiff must show either the supervisor personally was involved in the constitutional violation or that there is a 'sufficient causal connection' between the supervisor's conduct and the constitutional violation." *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003). This requires a finding of "deliberate indifference," meaning the supervisor

"'disregarded a known or obvious consequence of his [or her] action.'" *Id.* (quoting *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997)).  Negligence is insufficient.  *Hare*, 74 F.3d at 649–50.

## B.  Claims Against Kirk in His Individual Capacity

Nichols alleges that Kirk, the policymaker for BCDC, was tasked with the duty of providing adequate healthcare to the inmates of BCDC and failed to supervise and properly train the medical providers at the jail.[3]  Dkt. 11.  She contends that Kirk's policies allowed medical personnel to ignore serious medical needs because a doctor never personally and independently assessed LeJunie during or after intake.  *Id.*  She additionally contends that the policies were inadequate because they did not require follow up or monitoring even after receiving medical records that indicated the inmate had several chronic illnesses.  *Id.*  The defendants move for dismissal of the claims against Kirk in his individual capacity under Rule 12(b)(6), arguing that Nichols has not sufficiently stated a § 1983 claim against him.[4]  Dkt. 13.

Under § 1983, supervisory officials cannot be held liable for the actions of subordinates on any theory of vicarious or *respondeat superior* liability.  *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).  When the plaintiff alleges "a failure to train or supervise, 'the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'"

---

[3]  She also asserts these claims against an unknown medical supervisor.  *See* Dkt. 11 at 17.

[4]  The defendants additionally move for dismissal of any claims against Kirk in his official capacity, to the extent Nichols asserts them.  Dkt. 13.  However, the complaint states that the claims against Kirk are in his individual capacity, and Nichols reiterates that the claims are only in Kirk's individual capacity in the response to the motion to dismiss.  Dkts. 11, 15.

*Id.* (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)). "'For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Smith*, 158 F.3d at 912).

The defendants argue that Kirk, as a supervisor, is not liable for actions of his subordinates under § 1983 and that Nichols must therefore bring an individual capacity claim that Kirk was personally involved in the alleged deprivation of rights or that his allegedly wrongful actions are causally connected to the deprivation of rights. Dkt. 13. Nichols contends that she pled that Kirk is a policymaker who failed to train or supervise his employees on how to properly assess inmates and that this failure to train or supervise showed deliberate indifference to inmates' health and led to LeJunie's death. Dkt. 13. She asserts in the complaint that Kirk knew that the Sandra Bland Act (the "Act") applied to him and the BCDC and that Kirk allowed the Act to be violated by failing to train medical providers at the jail and that Kirk was aware that inmates who had chronic illnesses needed medical attention. Dkt. 11. Nichols additionally urges the court to follow an objective rather than subjective standard in determining whether Kirk acted with deliberate indifference, arguing that a reasonable person in Kirk's position should have known that inmates with serious medical needs would require care by a physician and that inmates who had prescriptions would need them. Dkt. 15. She contends that discontinuing life-saving medication without consulting LeJunie's physician or at least other physicians amounts to deliberate indifference. *Id.*

The court finds that Nichols's allegations are sufficient to plausibly state a claim against Kirk. Nichols does not assert claims under the Act, but she points to its existence as evidence of Kirk's knowledge. The Act was effective in Texas starting on September 1, 2017, and Nichols alleges that Kirk knew about it. Dkt. 11. The Act relates to a law enforcement agencies' efforts

when a person is "suffering a mental health crisis or suffering from the effects of substance abuse."
Tex. Code of Crim. P. Art. 16.23(a).  Nichols alleges that LeJunie was likely suffering from
withdrawal from Xanax, which may have caused him to not remember his entire medication history.
Dkt. 11.  It is unlikely that the Act would have applied under the facts of this case because the Act
requires that the mental health crisis or substance abuse issue potentially was the reason the person
committed the alleged offense.  *See* Art. 16.23(a)(4).  However, the allegation about Kirk's
knowledge of the Act's requirements makes it plausible that Kirk knew inmates should be evaluated
regarding psychological issues and associated medications by a physician in accordance with the Act,
and a policy of waiting for days until receipt of medical records, not following up, and then not
having a physician review medications in the medical records when they do show up, seems to run
afoul of the requirements of the Act and thus is probative of deliberate indifference to medical needs
in general.  While it is uncertain if such evidence will be sufficient to prove deliberate indifference
at the summary judgment stage, it meets the plausibility threshold.  The defendants' motion to
dismiss the § 1983 claim made against Kirk in his individual capacity is DENIED.

## C.    Claims Against the County Under *Monell*

The court now turns to the defendants' argument that Nichols fails to state a claim for which
the County could be held liable under *Monell*.  The Fifth Circuits sums up *Monell*'s requirements
as follows: "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker;
an official policy; and a violation of constitutional rights whose 'moving force' is the policy or
custom."  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).  The Fifth Circuit points
out that "the unconstitutional conduct must be directly attributable to the municipality through some
sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will
almost never trigger liability."  *Id.*  If the official policy is facially innocuous, it will still "support

10

liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 407, 117 S. Ct. 1382 (1997)). "[E]ach and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional." *Id.* at 580.

The defendants argue that the § 1983 claim against the County fails because there are no allegations of an official policy or custom that was the moving force behind any alleged violation of LeJunie's rights. Dkt. 13. They contend that the policy or custom and its relationship to the underlying constitutional violation must be pled with specificity, and Nichols merely alleges that the policies and practices do not require follow up or monitoring even after receiving an inmate's medical records that reflect several chronic illnesses. *Id.* The defendants argue that there are no actual allegations to support the claim and no evidence of any written policies or customs or practices. *Id.*

Nichols argues that the County is liable under *Monell* because the policies and practices that Kirk implemented caused LeJunie's death. Dkt. 15. She contends that *Monell* and its progeny are designed to guard against precisely the kind of municipal acquiescence to officer misconduct that happened at BCDC. *Id.* She points out that the question is whether the denial of medical care was committed pursuant to a policy or custom of the county that was the moving force behind the denial, and that an official policy may be shown through persistent and widespread practices; she contends that she shows this through the repeated denial of medical care throughout LeJunie's confinement. *Id.*

The court first notes that courts may not apply a heightened pleading standard to *Monell* claims. *Ratliff v. Aransas Cty., Tex.*, 948 F.3d 281, 284 (5th Cir. 2020) (citing *Leatherman v.*

11

*Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S. Ct. 1160 (1993)).  However, courts are not required "to accept 'generic or boilerplate' pleadings," and "the *Twombly* standard applies to municipal liability claims." *Id.*  Thus, "*Monell* pleadings 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "[P]lausibly to plead a practice 'so persistent and widespread as to practically have the force of law,' . . . a plaintiff must do more than describe the incident that gave rise to his [or her] injury."  *Pena v. City of Rio Grande City*, 870 F.3d 613, 622 (5th Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350 (2011)).

In her complaint, Nichols alleges that Kirk, the policymaker, "implemented an inadequate policy and practice of supervising medical care of inmates and to allow the medical personnel to ignore the serious medical needs because a doctor never personally and independently assess[ed] [LeJunie] during or after intake, which amounted to a failure to provide adequate medical care policy."  Dkt. 11.  She further alleges that Kirk's "policies and practices do not require any follow up or monitoring even after receiving an inmate's medical records reflecting several chronic illnesses."  *Id.*

She alleges a policymaker, and she alleges a policy of not requiring that physicians assess medical needs and follow up, and she contends that this policy resulted in LeJunie not receiving needed medication, which ultimately led to his death.  Theses allegations are sufficient at the pleading stage to assert a *Monell* claim, so long as there is a violation of a constitutional right.  The court now turns to whether the allegations relating to failure to provide medication are plausibly unconstitutional.

### D.    Conditions of Confinement

Nichols asserts that her claims are based on unconstitutional conditions of confinement.

Dkt. 15.  In the amended complaint, she alleges that medical personnel could have prescribed a lower

bunk, blood thinners, a compression sleeve, or tested for DVT, but they did not do so.  Dkt. 11.

Instead, they allegedly disregarded LeJunie's serious medical needs by denying access to medical

care and failing to administer treatment even after they received LeJunie's medical records.  *Id.*

Nichols argues that the County "maintains a de facto policy and practices of providing inadequate

medical care" as the nurses are not allowed to perform exams and can only report findings to

physicians.  Dkt. 15.  She contends that the outright denial or delay of access to a physician is not

reasonably related to a legitimate government objective, and an inmate's basic human needs include

access to medical care.  *Id.*

The defendants move for dismissal of Nichols's claims to the extent they are based on a

conditions-of-confinement theory.  Dkt. 13.  They assert that Nichols does not state a claim under

this theory because all harm allegedly resulted from acts or omissions and not the general conditions,

practices, rules, or restrictions of the detention center.  *Id.*  They argue that to the extent Nichols

attempts to point to county policies or an alleged failure to train, these issues are unequivocally based

on alleged omissions by individuals and thus fail.  *Id.* (citing *Anderson v. Dall. Cty. Tex.*, 286 F.

App'x 850, 59 (5th Cir. 2008)).  Thus, they argue that Nichols's allegations fit into the acts-or-

omissions framework and are not a constitutional attack on the general conditions, practices, rules,

or restrictions of pretrial confinement.  Dkt. 17.

In the Fifth Circuit, as the parties' arguments suggest, the court's analysis in § 1983 cases

varies depending on whether a plaintiff is alleging that an alleged deprivation of rights was caused

by an episodic act or omission of an individual state official or by the conditions of confinement.

*Wichita Cty.*, 795 F.3d at 462.  "A challenge to a condition of confinement is a challenge to 'general

conditions, practices, rules, or restrictions of pretrial confinement.'"  *Id.* at 463 (quoting *Hare*, 74

13

F.3d at 644). "An episodic-acts-or-omissions claim, by contrast, 'faults specific jail officials for their acts or omissions.'" *Id.* (quoting *Shepherd v. Dall. Cty.*, 591 F.3d 445, 452 (5th Cir. 2009)). "[T]here is no rule barring a plaintiff from pleading both alternative theories, and a court may properly evaluate each separately." *Id.* at 464.

The Fifth Circuit distinguishes between conditions-of-confinement and episodic acts-and-omissions cases by noting that in conditions-of-confinement cases the detainee complains of a "general condition of confinement," where it is generally the conditions themselves that constitute the harm, "for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions." *Scott*, 114 F.3d at 53. In contrast, in acts-or-omissions cases, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Id.*

In *Hare*, the Fifth Circuit extensively considered its "peripatetic route in invoking different measures of the constitutional rights of pretrial detainees to medical care and protection from harm" while "visit[ing] the measure of liability under the U.S. Constitution for failing to prevent a suicide by a pretrial detainee." 74 F.3d at 635, 643. The decedent's husband sued the city and individual defendants under § 1983, and the district court denied the individual defendants' motion for summary judgment based on qualified immunity. *Id.* at 635–36. An *en banc* Fifth Circuit determined that the district court had applied the incorrect legal standard and remanded the case for a review of the qualified immunity claims under the correct standard. *Id.* at 636. The court concluded "that both medical care and failure-to-protect cases should be treated the same for purposes of measuring constitutional liability," that the conditions-of-confinement test applied "only when a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial

14

confinement," and that it is inapplicable when "a pretrial detainee's claim is based on a jail official's episodic acts or omissions," as in such cases "the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Id.* at 643.  The court further explained that for the conditions-of-confinement "test to apply, a jailer's act or omission must implement a rule or restriction or otherwise demonstrate the existence of an identifiable intended condition or practice. . . . [I]n the absence of such a condition, practice, rule, or restriction, a jail official's act or omission can give rise to constitutional liability only if he was culpable . . . ." *Id.*  The court then extensively discussed the deliberate indifference standard for such acts or omissions claims.  *Id.*

If the facts of a case are appropriately considered under a conditions-of-confinement framework, courts apply the test found in *Bell v. Wolfish*.  *Wichita Cty.*, 795 F.3d at 463.  The question under *Bell v. Wolfish* is "whether those conditions amount to punishment of the detainee." 441 U.S. at 535.  The court must therefore determine "whether the [conditions or restrictions were] imposed for the purpose of punishment or whether [they were] but incident to some other legitimate governmental purpose." *Id.* at 538.  "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539.  If the condition is instead "arbitrary or purposeless," a court may infer that it is "punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* Thus, the plaintiff does not have to demonstrate that the state actor or municipality acted with intent to punish. *Wichita Cty.*, 795 F.3d at 463.  In determining whether an interest is legitimate, courts must keep in mind that the government's interests include not only its need to insure the detainee's presence at trial but also its legitimate interests in managing the facility. *Bell*, 441 U.S. at 540.  Sometimes challenged conditions are explicit, and sometimes they reflect a *de facto* policy. *Wichita Cty.*, 795 F.3d at 463.

15

Here, since the parties dispute whether the *Bell* test should apply or whether, like in *Hare*, the court must find deliberate indifference for discrete acts or omissions, it is helpful to review the facts and legal conclusions of the primary cases upon which they rely.  The defendants rely on *Scott v. Moore*, *Flores* v. *County of Hardeman, Texas*, and *Olabisiomotosho v. City of Houston*.  In *Scott v. Moore*, 114 F.3d 51 (1997), an *en banc* Fifth Circuit considered a complaint by a pretrial detainee that she was sexually assaulted while she was a pretrial detainee and that the assault was a result of improper staffing procedures at the jail.  The plaintiff argued that adequate staffing would require at least one female jail official or, if male, two officials on duty at a time when a female detainee is in custody.  114 F.3d at 52.  The district court granted summary judgment in favor of the city defendant.  *Id.*  Eventually, the *en banc* Fifth Circuit considered the plaintiff's case in light of *Hare*.  The court pointed out that in an episodic act-or-omission case, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission."  *Id.* at 53.  The court noted that in many cases "the conditions themselves constitute harm," but that the plaintiff in *Scott* suffered because of the jailer's specific sexual assaults, and the case therefore did "not fit well within the conditions-of-confinement category" and bore a "closer resemblance to cases regarding episodic acts by prison employees."[5]  *Id.* at 54.  The defendants here argue that this case, likewise, does not fit well

---

[5]  Similarly, in *In re Estate of Henson v. Wichita County*, the Fifth Circuit determined that claims against a physician in charge of the jail who the plaintiffs claimed acted with deliberate indifference in failing to provide appropriate medical evaluation or transport the detainee, who ended up dying in custody, were "properly characterized . . . as attacking episodic acts or omissions rather than conditions of [the detainee's] confinement."  795 F.3d at 464–65.  Conversely, it treated the claims that the county did not have adequate facilities, equipment, or trained staff to treat detainees who had serious illnesses as a conditions-of-confinement claim.  *Id.* at 466–67.

16

into the conditions-of-confinement framework.

The other two cases relied upon by the defendants likewise involve a decision by the Fifth Circuit that the cases did not "fit" into the conditions-of-confinement framework. In *Flores*, the plaintiff's decedent committed suicide while he was a pretrial trainee. *Flores v. Cty. of Hardeman, Tex.*, 124 F.3d 736, 737 (5th Cir. 1997). The detainee was a male, and the custodial officer was a female. *Id.* at 737. When the officer could not see the detainee and he did not answer when she called out to him, she got another officer, who was outside, to go into the cell with her because female officers were not allowed to enter the cells of male inmates alone. *Id.* The family brought a § 1983 claim, alleging both episodic acts-or-omissions and conditions-of-confinement claims. *Id.* at 738. They based their conditions-of-confinement claim on the training and staffing policies of the jail and the acts-or-omissions claim on the acts and omissions of the Sheriff. *Id.* The Fifth Circuit determined that the case was similar to the jail suicide in *Hare*, which it had construed as an acts-or-omissions case, and it thus analyzed the plaintiff's claims under that theory. *Id.*

In *Olabisiomotosho v. City of Houston*, the Fifth Circuit considered a case where the plaintiff's case turned on the alleged failure of specific defendants to "take better care of [the plaintiff,]" and the alleged failure to medically screen her and secure treatment. 185 F.3d 521, 526 (5th Cir. 1999). The plaintiff suffered from severe chronic asthma and needed a prescription inhaler. *Id.* at 524. She had allegedly requested to take her inhaler before she was transported to jail, and one of the officers allowed her to retrieve it from her car and use it. *Id.* However, she was coughing, wheezing, and short of breath by the time she got to the jail, and she told officers she needed to see a doctor. *Id.* She was eventually taken to a cell, where she stayed until the next morning. *Id.* She contended that she asked two officials if she could see a doctor and was told the clinic was closed. *Id.* She also contended that she was not medically screened during the booking process. *Id.* When

17

the plaintiff appeared at her initial hearing the next day, she told the judge that she was having an asthma attack and the jail clinic was closed; the judge ordered the guard to take the plaintiff to the jail clinic for treatment. *Id.* Eventually, after the plaintiff fainted, jail personnel treated her for an asthma attack and transported her to a hospital, but she lapsed into a coma and even temporarily lost her eyesight. *Id.* She sued and alleged a deliberate denial of medical treatment. *Id.* at 525. The Fifth Circuit considered whether her claims were best characterized as a condition of confinement or an act or omission, and it concluded that her complaint "perfectly [fit] the definition of the episodic omission." *Id.* at 526.

Nichols relies, primarily, on *Shepherd v. Dallas County*. In *Shepherd*, a pretrial detainee suffered a stroke when the Dallas County Jail failed to administer medication for his chronic hypertension, and the district court held that the failure to provide the medication was the result of a de facto policy that denied adequate care for inmates with chronic conditions. 591 F.3d at 449. The plaintiff in *Shepherd* informed a nurse that he had hypertension and needed his medication twice daily, and he requested the medication several times during his first two weeks in jail. *Id.* After the plaintiff's blood pressure reading was high, ten days after booking, a nurse practitioner noted on the plaintiff's chart that he wanted a specific medication and then prescribed a different medication. *Id.* The *Shepherd* plaintiff "waited weeks between doses, was not monitored, and received no other medical treatment." *Id.* After he had been in jail almost two months, he went to the jail clinic because he had a severe headache, and his blood pressure was again high. *Id.* A physician gave him one dose of the medication the plaintiff had originally requested and ordered that his blood pressure be checked again in three days. *Id.* Four days later, his blood pressure was at a level considered a hypertensive emergency, and he was provided nitroglycerine and finally a prescription for the medication he originally requested, twice a day. *Id.* Two days later, he again had extremely high

18

blood pressure and the nurse noted that he had not received his medication as ordered.  *Id.*
Unfortunately, the plaintiff again did not receive his medication for several weeks, despite
complaints by him and his wife, and he had a stroke that left him permanently confined to a
wheelchair, and he lost most of his left-side functions, including left-side hearing and sight, and
slurred speech.  *Id.* at 450.

The *Shepherd* plaintiff filed claims under both conditions-of-confinement and acts-or-
omissions theories, and the district court granted summary judgment on the episodic acts claim
because the plaintiff had been unable to provide evidence that any specific employee was
deliberately indifferent.  *Id.*  At trial, the plaintiff presented evidence of the treatment of other
inmates with chronic illnesses, including evidence that the medical program was understaffed, at
times there was no medical personnel at the jail, and that fifty percent or more of prescriptions
regularly went undelivered to inmates.  *Id.*  A jury found in favor of the plaintiff, and both parties
appealed.  *Id.*

One of the issues on appeal was whether the district court erred in classifying the case as an
attack on conditions of confinement.  *Id.* at 452.  The Fifth Circuit noted that in "some cases, a
condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions
'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by
[jail] officials, to prove an intended condition or practice.'" *Id.* (quoting *Hare*, 74 F.3d at 645).  The
court noted that this is a heavy burden, as the condition must be "arbitrary or purposeless" and not
"related to a legitimate goal."  *Id.* (citing *Bell*, 441 U.S. at 539).  The court determined that to the
plaintiff's original complaint contained "the full theory of the case"—that the jail's treatment of
inmates with chronic illnesses was grossly inadequate—and that these deficiencies caused the
plaintiff's injury.  *Id.* at 453.  To survive summary judgment, the plaintiff provided "extensive

19

independent evidence on the jail's treatment of inmates with chronic illness." *Id.*  The Fifth Circuit determined that the district "court could reasonably infer a *de facto* jail policy of failing properly to treat inmates with chronic illness." *Id.*  The Fifth Circuit clarified that "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate." *Id.* at 454.  Instead, "a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for [the plaintiff's] basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights." *Id.*

Here, the case is at the motion to dismiss stage, and the allegations in the amended complaint indicate that a policy, or lack thereof, is to blame for the failure of the nurses to give LeJunie his medication, even after receiving his medical records, or refer him to a physician to get the medication.  This seems to be an attack the "general conditions, practices, rules, or restrictions of pretrial confinement."  Whether the evidence rises to the type of pervasive pattern the Fifth Circuit required in *Shepherd* or should only be analyzed under the acts-or-omissions framework like in *Scott*, *Flores*, and *Olabisiomotosho* will likely be determined at the summary judgment stage.  The court finds that Nichols has plausibly pled that arbitrary and purposeless conditions-of-confinement led to LeJunie's death.  The motion to dismiss this claim for failure to state a claim is DENIED.

**E.     Acts or Omissions**

In episodic-acts-or-omissions claims, the plaintiff points to the acts or omissions of specific jail officials.  *Estate of Henson*, 795 F.3d at 463.  The plaintiff complains first of a certain act or omission and then "'derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.'"  *Id.* (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)).  Intentionality is not presumed for episodic-acts-or-omissions claims, and a jail

official violates the pretrial detainees constitutional rights "when the official had 'subjective knowledge of a substantial risk of serious harm' to the detainee and responded to that risk with deliberate indifference." *Id.* at 464 (quoting *Hare*, 74 F.3d at 650). "In other words, the state official must know of and disregard an excessive risk to inmate health and safety." *Id.*

The defendants argue that Nichols has failed to plead a plausible acts-or-omissions claim for failure to provide adequate medical treatment because none of her allegations supports a claim that the BCDC staff acted with deliberate indifference when they failed to provide LeJunie with his prescription medication. Dkt. 13. The defendants point out that an inmate's disagreement with his medical treatment alone is insufficient to show deliberate indifference. *Id.* They note that the first amended complaint does not point to any specific members of the BCDC staff who allegedly had subjective knowledge that LeJunie would be harmed if he did not receive his medication. *Id.* They contend that the first amended complaint indicates that LeJunie was treated by nurses and EMTs and was given a white pill and that the BCDC did not even receive LeJunie's medical records until he had been there four days, which was two days before he was released. *Id.* They assert that the first amended complaint's allegations show that the BCDC made efforts to obtain medical records and provided LeJunie with some medical treatment and medication, and they argue that this means they did not refuse to treat LeJunie, ignore him, or intentionally treat him incorrectly. *Id.*

The defendants further argue that even if the first amended complaint adequately alleged deliberate indifference, it contains no allegations to support causation between the denial of the medication and LeJunie's death. *Id.* They contend that there is no information in the first amended complaint regarding what LeJunie did during the four days between his release and his passing, and thus no connection between the delay in receiving medication while he was incarcerated and his death. *Id.*

21

Nichols argues that the BCDC was deliberately indifferent to LeJunie's medical needs because the BCDC staff failed to treat LeJunie for a serious medical condition requiring medication even though he disclosed the condition upon arrival and his mother told the staff about it. *Id.* Nichols points out that the only effort the BCDC made after being alerted of LeJunie's conditions was to order his medical records. *Id.* She additionally argues that she sufficiently alleged causation because the first amended complaint states that the autopsy report demonstrates the cause of LeJunie's death was one of the serious medical conditions that the BCDC refused to treat LeJunie for. *Id.* That report indicates that LeJunie died of a pulmonary embolism due to DVT, and the purpose of the Warfarin LeJunie's physician had prescribed was to prevent the blood clots that killed LeJunie from forming. *Id.*

In reply, the defendants reiterate that the first amended complaint does not say what LeJunie did during the 84 hours between his release and death, including whether he took his medication during that time, sought medical treatment, or consumed any illegal or legal substances that may have impacted his health. Dkt. 17.

First, the court finds that it is inappropriate to wrestle with the causation issue at this point in the litigation since there is no expert testimony. At the motion to dismiss stage, the court must determine plausibility, and it is plausible that not receiving an essential medication that prevents blood clots caused a death by a blood clot 84 hours, or approximately four days, later. The possibility that there may have been an intervening or superseding cause does not negate plausibility in this case.

As to deliberate indifference, the court finds that the allegations in the complaint that the BCDC knew about LeJunie's condition, including the fact that his medical records were received three days before release, but he still only received one white pill during his stay notwithstanding his

extensive medication requirements, and he never saw a doctor who could make sure that he had the medication and other medical care he needed for reported serious medical conditions, plausibly assert deliberate indifference.  Nichols will, of course, need evidence of subjective intent to maintain her acts or omissions claim at the summary judgment stage.  The defendants' motion to dismiss the § 1983 claim against BCDC to the extent it is an acts or omissions claim is DENIED.

**F.     Fourth Amendment**

Nichols contends in her first amended complaint that the defendants' acts or omissions violated LeJunie's right to be free from an unreasonable search and seizure.  Dkt. 11.  The defendants argue that there are no explanations or details regarding how LeJunie's Fourth Amendment rights were allegedly violated.  Dkt. 13.  They point out that the only seizure mentioned is LeJunie's arrest, and LeJunie was not arrested by a Brazos County officer.  *Id.*

It is unclear from Nichols's complaint why she is bringing a Fourth Amendment claim.  *See* Dkt. 11.  In her response, she invokes Justice Alito's dissent in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2479 (2015) (Alito, dissenting), to argue that a pretrial detainee should be able to bring a Fourth Amendment claim based on excessive force by a detention facility employee.  Dkt. 15.  She also argues that the standard should be objective, not subjective.  *See id.* (also citing the *Kingsley* dissent).  In reply, the defendants assert that the passing reference to the Fourth Amendment in the first amended complaint is insufficient to satisfy the pleading standard and that the response's reference to excessive force does not allow the court to read that into the complaint.  Dkt. 17.

In *Kingsley*, the U.S. Supreme Court considered a claim in which a pretrial detainee alleged that jail officers used excessive force against him in violation of the Fourteenth Amendment's Due Process Clause.  135 S. Ct. at 2470.  The Court determined that the legal standard to prove an excessive force claim is objective, not subjective.  *Id.*  It is unclear what application this case has to

23

Nichols's seeming attempt to plead a Fourth Amendment violation other than that Nichols is requesting an objective standard.  Since there are no claims in the amended complaint that relate to excessive force or to an unreasonable search and seizure, the case is not relevant to the motion to dismiss the Fourth Amendment claim.  The defendants' motion to dismiss the Fourth Amendment claim, to the extent Nichols is attempting to assert one, is GRANTED.

## G.    State Law Claims

In the first amended complaint, Nichols asserts that each defendant is liable to her for LeJunie's death resulting from the defendants' deliberate indifference, reckless, wrongful acts or omissions. Dkt. 11 (citing Tex. Civ. Prac. & Remedies Code §§ 71.002, 71.004(c)), 71.021).

The defendants argue that the state-law claims are barred by governmental immunity and that Nichols also has not alleged any facts involving the use of tangible personal or real property sufficient to invoke waiver of immunity under the Texas Tort Claims Act ("TTCA").  Dkt. 13 (citing Tex. Civ. Prac. & Remedies Code Ann. § 101.021(2); *Univ. of Tex. Med. Branch v. Kai Hui Qi*, 402 S.W.3d 374. 390 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Holland v. City of Houston*, 41 F. Supp. 2d 678, 711 (S.D. Tex. 1999)).  Additionally, they argue that while a waiver possibly could be invoked if the claim involved real property, *see Nunez v. City of Samsom Park*, 197 S.W.3d 837, 842–43 (Tex. App.—Fort Worth 2006, no pet.), Nichols has not brought a premises defect claim or alleged any shortcomings or imperfections at BCDC.  *Id.*  The defendants additionally contend that Nichols's claims for negligence and wrongful death and survivorship fail because the substance of the claims is failure to act or non-use of property, and the tort claim waiver is inapplicable.  *Id.* (citing *Qi*, 402 S.W.3d at 389).

Nichols argues that the state law claims cannot be barred by the TTCA because there is no allegation of state law negligence in the pending complaint.  Dkt. 15.

"[U]nder the common-law doctrine of sovereign immunity, a municipality is immune from tort liability for its own acts or the acts of its agents unless the Texas Tort Claims Act [("TTCA")] waives immunity." *City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998); *see, e.g.*, Tex. Civ. Prac. & Rem. Code Ann. §§ 101.051–.067. The TTCA creates a limited waiver of sovereign immunity for "certain negligent conduct, but it does not waive immunity for claims arising out of intentional torts." *Saenz v. City of El Paso*, 637 F. App'x 828, 830 (5th Cir. 2016) (quoting *City of Watauga v. Gordon*, 434 S.W.3d 586, 594 (Tex. 2014)). Thus, "[i]f a plaintiff pleads facts which amount to an intentional tort, no matter if the claim is framed as negligence, the claim generally is for an intentional tort and is barred by the TTCA." *Id.* However, the TTCA waives immunity for death caused by an employee acting within the scope of his or her employment if the death (1) arose from the use of a motor vehicle or equipment and the employee would be personally liable under Texas law; or (2) was "caused by a condition or use of tangible personal property or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code Ann. § 101.021.

Nichols does not argue that the state has waived its immunity with regard to the wrongful death statute or the survivorship statute, and courts generally find that there is no waiver of immunity under Chapter 71. *See Boyd v. City of River Oaks, Tex.*, Nos. 4:13-CV-443-A, 4:13-CV-511-A, 2014 WL 201704, at *6 (N.D. Tex. Jan. 16, 2014) (collecting cases for the proposition that "[o]ther courts to consider the issue have failed to find waiver of immunity as to claims under Chapter 71"). Since there is no waiver of immunity, Nichols may not sue the County under these statutes for LeJunie's death. The defendants' motion to dismiss the wrongful death and survivorship claims against the County is GRANTED.

## IV. CONCLUSION

The defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART.  It is GRANTED with regard to Nichols's claims against the County under Texas state law and any potential claims against the defendants relating to the Fourth Amendment.  These claims or potential claims are DISMISSED WITH PREJUDICE.  The motion to dismiss is otherwise DENIED.

Signed at Houston, Texas on February 26, 2020.

Gray H. Miller
Senior United States District Judge